UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| CHRISTOPHER L. GILES, | ) |
| Plaintiff, | ) |
| v. | ) Case No.: 2:20-cv-00723-JHE |
| ALABAMA GOODWILL INDUSTRIES, | ) |
| Defendant. | ) |

### MEMORANDUM OPINION[1]

Through his amended complaint, Plaintiff Christopher L. Giles ("Giles") brings this employment discrimination action against Defendant Alabama Goodwill Industries ("Goodwill"), alleging discrimination on the basis of race and age. (Doc. 21). Goodwill has moved for summary judgment. (Doc. 44). Giles opposes that motion (doc. 49), and Goodwill has filed a reply in support (doc. 51). For the reasons stated more fully below, Goodwill's motion is **GRANTED**.[2]

### I. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 14).

[2] The parties have requested oral argument. (Doc. 44 at 1; doc. 49 at 1). The undersigned does not find oral argument would be helpful in this case.

1

establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish there is a "genuine issue for trial." *Id.* at 324. (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Summary Judgment Facts

### A. Background

On or about November 16, 2015, Goodwill hired Giles, who is a black male over the age of 60, as a Job Placement Specialist. (Doc. 21 at ¶¶ 7, 39; Deposition of Christopher Giles (doc. 50-1, "Giles Depo.") at 8 (20:5-11), 22 (74:7-10)). In that role, Giles was responsible for teaching job readiness classes, building resumes, helping with job searches, taking clients to job fairs and interviews, and helping clients apply for jobs. (Giles Depo. at 22 (74:11-16)). Giles remained a Job Placement Specialist for about four years until he was promoted to Director of Missions Services in June 2019. (*Id.* (74:17-23); doc. 21 at ¶ 9).

When Giles was promoted, he took on some supervisory responsibilities. (Giles Depo. at 22 (75:1-18)). Specifically, Giles supervised Sam Holmes ("Holmes"), a younger white male. (*Id.* (75:1-76:23); doc. 21 at ¶ 10). Giles was himself supervised by Angela Preston ("Preston," black female), formerly Vice President of Human Resources at Goodwill, and Vice President of Organizational Development Amanda Ford ("Ford," black female),[3] whom Goodwill hired on October 7, 2019 to take over a portion of Preston's former responsibilities. (Giles Depo. at 14 (45:12-14), 37 (134:17-22); Ford Depo. at 5-6 (10:18-11:3, 16:2-13)). After her hire, Ford supervised Preston and was in turn supervised by David Wells (white male). (Ford Depo. at 6

---

[3] Giles testified he did not believe Ford to be black, but admitted he was unsure of her race and had never asked her about it. (Giles Depo. at 37 (134:17-135:7)). Ford described her ethnicity as "Jewish, Native American, and black." (Ford Depo. at 23 (82:21-22)). Giles possibly suggests Defendant's Exhibit K (described by Goodwill as "Chart listing terminations from Goodwilll," (doc. 45 at 2)) may contradict this (doc. 49 at 10), but Giles does not say how or cite to any specific portion of the exhibit. In any case, the undersigned has found no record evidence—in Defendant's Exhibit K or otherwise—to call Ford's self-identification into question.

(15:7-8, 16:14-16), 23 (84:14-85:3)).

While supervising Giles, Preston told him he needed to learn technology and have more computer skills, which Giles interpreted as an age-related comment. (Giles Depo. at 41 (152:15-23)). Ford made comments about Giles being "too slow giving her information" and that projects were late, which Giles also considered to be because of his age. (*Id.* (153:3-12)).

### B. Holmes's Disciplinary History

Although Giles supervised Holmes, Giles testified he did not feel he had the ability to discipline him because Preston and Ford did not allow it. (Giles Depo. at 14 (44:17-45:21)). Giles testified he was cautious about disciplining Holmes after an incident in which Holmes was upset after attempting to borrow money from the company. (*Id.* at 22 (77:16-78:11)). Giles tried to calm Holmes down, but Preston heard voices and intervened, believing Giles was upset. (*Id.*). Preston ended up disciplining Giles for the incident. (*Id.*). Consequently, despite the fact that Holmes was constantly late, Giles did not discipline him for this. (Giles Depo. at 22-23 (77:4-14)). Ford also caught Holmes coming in late and sleeping on the job, but did not discipline him either. (*Id.* at 23:12-17)). Ford testified that although she had the authority to discipline Holmes, she delegated that responsibility to Giles, Holmes's direct supervisor. (Ford Depo. at 6-7 (17:9-18:11)). She did not exercise that authority because it "would be in poor form" to circumvent Holmes's supervisor, although she could not identify a specific Goodwill policy to support this. (*Id.* at 7 (18:12-20:11)). Giles also stated he was "out in the field" when incidents involving Holmes happened. (*Id.* at 38 (139:21-140:4)).

In one incident (the "Jackass Incident"), Giles believed Ford heard Holmes refer to disabled special needs children as "jackasses," but Holmes was never disciplined for this. (*Id.* at 23 (78:17-

4

23)). Giles testified Ford should have disciplined Holmes because she heard Holmes's comments; Giles had not been present for the incident, but stated that if he had been there and heard the comments, he would have written Holmes up. (*Id.* at 40-41 (148:15-150:21)). Ford testified she did not actually hear Holmes say this but had received two statements regarding the incident. (Ford Depo. at 7-8 (21:16-22:14), 21 (76:14-77:7)). One statement said Holmes used the word "jackasses," and the other indicated Holmes was quoting from a skit and was "trying to say something that was in—humorous, but of course in very much poor humor." (*Id.* at 8 (22:17-23:3)). Ford stated Giles asked Holmes about the incident and reported back to her that Holmes was "joking around." (*Id.* (23:21-24:9)).

In another incident (the "Bus Incident," which Giles also did not personally witness), Holmes called Giles to report that they had a problem: a child from a Birmingham city school had been left at Goodwill after a work learning program. (Giles Depo. at 24 (82:5-83:19), 48 (178:1-18))). Holmes had apparently not checked roll or counted heads prior to the rest of the children getting on the bus to return to school. (*Id.* at 24 (84:11-16)). Giles testified neither Preston nor Ford disciplined Holmes for this incident; he believed they, not him, should have done so because they "saw it when it happened." (*Id.* (84:18-22)). Ford testified she found out about the incident from Giles and, believing Holmes should be terminated for it, talked with Giles. (Ford Depo. at 8 (24:10-25:1)). However, Giles stated that Holmes had made a mistake; Giles did not want to write him up and would not terminate him. (*Id.* (25:9-12)). They compromised on issuing Holmes a written documentation. (*Id.* (25:12-14)).

Giles wrote Holmes up in a Performance Record, but Ford told Giles what to write in the

5

report.[4]  (*Id.* at 9 (26:6-12)).  The Performance Record, issued on November 1, 2019, includes both the Jackass Incident and the Bus Incident, stating: "Two team members at Alabama Goodwill overheard Mr. Sam Holmes use, [sic] Inappropriate language in the classroom and bus incident, on October 29, 2019."  (Doc. 45-10 at 1).  The Performance Record indicates Holmes violated the core values of "Donors and Customers," "Integrity," and "Continuous Improvement," and the conduct and behavior guidelines of "The use of profanity or abusive language" and "Failure to notify AGI regarding expiration or suspension of a license or certification, for jobs that always require current license and certification."  (*Id.* at 1-2).  As corrective action, the Performance Record requires Holmes to complete additional training and meet with his "Team leader coach" weekly.  (*Id.* at 2).  This was the only time Giles wrote Holmes up.  (Giles Depo. at 14 (45:3-9)).

Giles completed a performance evaluation for Holmes on July 30, 2019, but did not indicate that Holmes had committed any violations (including tardiness).[5]  (Doc. 45-9; Giles Depo. at 24-25 (85:11-87:8)).  Ford testified that she only became aware Holmes was arriving to work late after Giles was terminated on December 2, 2019 (discussed further below), when Holmes's new supervisor documented the violations.  (Ford Depo. at 9 (28:13-23); Giles Depo. at 49 (182:21-23)).  Holmes was ultimately terminated in approximately March 2020 for poor work performance.  (Ford Depo. at 9-10 (29:6-30:6)).

---

[4] Contradicting his testimony from earlier in his deposition and the written document itself, Giles testified Holmes was never disciplined for the Bus Incident.  (Giles Depo. at 48 (179:5-8)).

[5] Since Ford was hired in October 2019, this evaluation necessarily occurred before both the Jackass Incident and the Bus Incident.

### C. Giles's Disciplinary History

Giles received good marks on his performance evaluations during his tenure with Goodwill. (*See* doc. 45-1). These included interpersonal skills ratings of 5/5 (representing "extremely cooperative, stimulates teamwork and good attitude with others") on January 19, 2018, and 3/5 (representing "cooperative, gets along well with others") on December 3, 2018. (*Id.* at 13, 19). However, Giles was also the subject of several disciplinary actions.[6]

One of these occurred on June 21, 2018, when Giles received a two-day suspension for insubordination with the notations "refusal to obey orders" and "other." (Doc. 45-3 at 1). This suspension was accompanied by a written memo from Preston. (*Id.* at 2-3). In the memo, Preston indicated Giles called her at 9:30 that morning to inform her that he recently had dental surgery and had to wear a mask. (*Id.* at 2). Giles asked to come to work, but Preston told him that he could only do so if he was cleared by his doctor with no restrictions. (*Id.*). Giles stated he would get the documentation but would not be able to attend a scheduled meeting because of the mask. (*Id.*). Giles informed Preston he would come into the office to talk to "Mr. Don" (Goodwill's executive director (*see* Giles Depo. at 27 (97:5-6)) about the matter. (Doc. 45-3 at 2). About ten minutes later, Giles showed up at the office and spoke with Preston and Mr. Don, during which Mr. Don stated to Giles that he needed a medical release to return to work. (Doc. 45-3 at 3). Giles informed Mr. Don that he would go pick up the paperwork. (*Id.*). About thirty minutes later, Preston's receptionist told her that the paperwork was in Preston's box and that Giles was in his

---

[6] Giles spends a portion of his response disputing the incidents described below were actually inappropriate (doc. 49 at 6-8), but not that he received the discipline itself.

office.  (*Id.*).  The paperwork was "very unprofessional looking" and did not mention anything about Giles being able to return to work.  (*Id.*).  When Preston confronted Giles about this, Giles stated he was not leaving and that she needed to contact the doctor's office, and that Preston did not understand or know what she was doing.  (*Id.*).  Preston called the doctor's office and was informed that they would fax the appropriate documentation over; she then returned to Giles's office and indicated to Giles that he could not stay until she got the documentation.  (*Id.*).  The remainder of the memo is cut off.

Giles's account of this incident differs.  He testified Preston asked him to come to the meeting, but then screamed at him for being inappropriately dressed when he arrived in jeans and wearing a mask.  (Giles Depo. at 26 (92:13-93:4)).  Preston told Giles to leave without an opportunity for Giles to offer an explanation.  (*Id.* (93:4-9)).  Giles disputes he did not provide documentation from his dentist supporting his return to work; instead, he testified he provided Preston with the information she had requested.  (*Id.* at 28 (99:2-20)).  Although the written warning is signed "Chris Giles," Giles denied the signature was his.  (*Id.* at 29 (102:4-21)).  However, he conceded he received a two-day suspension.  (*Id.* at 26 (92:4-10)).

Giles also received a disciplinary Performance Record ("PR") from Preston on February 22, 2019 marked "Final."  (Doc. 45-3 at 4).  In the PR, Preston states she had "spoken with [Giles] about [her] concerns regarding inappropriate interpersonal communications in accordance of what is expected of you as a Director of Mission Services."  (*Id.*).  The PR describes two specific instances.  First, on October 25, 2018, the PR indicates Giles became "very defensive, loud, and hostile" with Preston and an ADRS Unit Director during a meeting.  (*Id.*).  Preston told Giles after the meeting that his behavior was unprofessional and inappropriate, and it ultimately resulted in a

8

decline in referrals to the agency. (*Id.*). Second, on February 20, 2019, Giles "became very loud and agitated" during a meeting with a Rehab Specialist, so much so that Preston had to separate them. (*Id.*). Giles then became "disruptive and unprofessional" while speaking to Preston. (*Id.*). Giles's behavior made employees and guests feel uncomfortable. (*Id.*). Preston indicated that "without significant improvement your continuation as a successful employee in our organization is in jeopardy." (*Id.*). The PR indicates Giles violated guidelines requiring "Treating all customers, donors, visitors and team members of Goodwill courteously" and "Refraining from behavior or conduct deemed offensive or undesirable, or which is subject to corrective action," and listed the offense itself as "Insubordination." (*Id.* at 5). Giles was required to demonstrate immediate improvement in the area of "Inappropriate Communication," and the PR states Giles would be required to attend Stress and Anger Management training. (*Id.* at 6). The PR is signed by Giles and Preston, but Giles testified the signature was not in fact his. (*Id.*; Giles Depo. at 35 (129:3-17)). Giles also disputes the accuracy of the facts as alleged in the PR. (Giles Depo. at 36 (130:1-21)). Giles states anger management counseling was discussed, but he was never referred. (*Id.* at 11 (33:5-13)).

### D. Giles's Termination

On about November 25 or 26, 2019—right before Thanksgiving, which was on November 28, 2019—Ford asked Giles to do an executive summary of a project Goodwill was working on with Impact America. (Giles Depo. at 49 (183:8-184:6); Ford Depo. at 14-15 (49:16-20)). The project was due that Wednesday, November 27, 2019. (Ford Depo. at 13 (45:2-13)). Giles delegated some of the responsibility for that project to Holmes, and they worked on it until Wednesday, when the project was due. (Giles Depo. at 49 (184:13-21)). Giles had to leave early,

9

so he assigned Holmes to complete the project. (*Id.* at 49 (184:17-19), 59 (224:4-8)). Giles believed he needed information from outside the company to complete the executive summary, which he could not get until after the Thanksgiving holiday. (*Id.* at 49 (185:3-17)). Ford's understanding was that Giles would not need to get any information from anyone else.[7] (Ford Depo. at 14 (48:5-15)).

The following Monday—December 2, 2019—Ford came into Giles's office and asked him if the executive summary had been completed. (Giles Depo. at 51 (190:2-10); Ford Depo. at 13 (45:14-16)). The parties' accounts of what happened diverges here.

Giles testified he told her he did what he could, and that he was waiting for Holmes to get to work to deliver the report. (Giles Depo. at 51 (190:10-12)). At around 10:12, Holmes emailed the report and Ford and Giles looked it over. (*Id.* (190:13-18)). Ford was upset that information in the executive summary was missing, and when Giles explained that they were waiting for information from other agencies, Ford told Giles not to take up for Holmes. (*Id.* (190:19-191:13)). Giles tried to call Holmes into his office, but Ford told Giles this was between the two of them. (*Id.* (191:14-16)). Ford left Giles's office, after which he entered Holmes's office to ask what had happened. (*Id.* (191:17-19)). At that point, Ford returned, and screamed at Giles that he had to leave. (*Id.* (191:19-23)). Giles has also submitted an affidavit from coworker Yodora Holt ("Holt") stating Ford was talking to Giles in a "forceful manner" during this last portion, and that Holt did not see Giles do or say anything that appeared to be threatening towards Ford. (Doc. 49-

---

[7] Although Giles discusses his work on the assignment in greater detail (doc. 49 at 14), neither the exact nature of the assignment nor who was correct about its scope are material to the claims Giles asserts.

1).

According to Ford, Giles refused to give her the summary. (Ford Depo. at 14 (46:4-5)). Giles then began yelling for Holmes to come into the room. (*Id.* (46:16-47:1)). Giles, who is six feet eight inches tall (Giles Depo. at 33 (119:8-9)), stood up very close to Ford, who is five feet two inches tall. (Ford Depo. at 16 (56:7-9)). Ford has submitted an affidavit stating the threatening portion of the encounter occurred here, out of Holt's view. (Doc. 51-1 at 3). After Ford left Giles's office, she heard Giles leave his office; in her words, Giles was "yelling very loudly to [Holmes] about me and who did I think I was and he's not going to let me say that I did something wrong, and that's what made me turn around." (Ford Depo. at (55:16-21)). Ford went back to Holmes's office to calm Giles down and prevent him from causing a disruption. (*Id.* at 16-17 (55:9-13, 58:2-5)). Ford decided to fire Giles because he "chose to intimidate," was "out of control . . . very disruptive," and twice refused to give her the executive summary. (*Id.* at 17 (58:20-3)).

Ford completed a PR indicating Giles was terminated. (Doc. 45-7). The PR lists violations of the following conduct and behavior guidelines: "Performing assigned tasks efficiently," "Treating all customers, donors, visitors and team members of Goodwill courteously," "Refraining from behavior or conduct deemed offensive or undesirable, or which is subject to corrective action," "The use of profanity or abusive language," "Insubordination: the refusal by a team member to follow management's instructions concerning a job-related matter, or lack of responsiveness to supervision," and "Engaging in conduct likely to cause or actually causing personal injury, or likely to create an offensive work environment." (*Id.* at 1-2). The PR is accompanied by a memo generally setting out Ford's version of events, culminating with the observation "Chris has shown time and time again that despite the coaching, classes and

11

opportunities given to him that he can't control his temper in a professional work environment, nor can he consistently comply with our values — especially respect and teamwork." (*Id.* at 3).

Ford later called Giles and informed him they needed to meet the next morning at 9:00. (Giles Depo. at 57 (216:20-217:1)). When Giles arrived, the doors were locked. (*Id.* (217:2-9)). Giles was escorted into the office and Ford told him that he had been terminated and that he needed to sign a form. (*Id.* at 57-58 (217:10-218:1)). Giles turned in his keys and was escorted out. (*Id.* at 58 (218:1-9)).

Giles was subsequently replaced by Tomeka Robinson, a black female who is approximately fifty years old.[8] (Ford Depo. at 23 (82:9-16)).

### III. Analysis

The counts that remain in the operative complaint allege race discrimination under both Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e, *et seq.*) and 42 U.S.C. § 1981, and age discrimination under the Age Discrimination in Employment Act of 1967 ("ADEA").[9]

A Title VII plaintiff asserting a disparate treatment claim must show the defendant acted with discriminatory intent. *Denny v. City of Albany*, 247 F.3d 1172, 1182 (11th Cir. 2001). "In order to show discriminatory intent, a plaintiff must demonstrate that the decisionmaker selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its

---

[8] Giles states "Ms. Robinson did not take on Plaintiff's position to his knowledge," (doc. 49 at 9), but cites no record evidence to contradict this.

[9] The amended complaint also contains a sex discrimination claim (doc. 21 at 7-8), but the undersigned dismissed that claim. (*See* doc. 31). Although the undersigned allowed Giles an opportunity to move for leave to amend his complaint further to support the sex discrimination claim (*id.* at 7-8), Giles declined to do so.

adverse effects on an identifiable group." *Joe's Stone Crab, Inc.*, 220 F.3d at 1273 (internal quotation marks, alterations, and citation omitted). "[T]he analysis of disparate treatment claims under § 1983 is identical to the analysis under Title VII where the facts on which the claims rely are the same." [10] *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (citations omitted).

Under the ADEA, it is unlawful for employers to discriminate against employees who are over forty years old "because of" their age. *See* 29 U.S.C. §§ 623(a)(1), 631(a). The Supreme Court has explained that this standard requires an ADEA plaintiff to show "but-for" causation. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009). "[A] but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause." *Bostock v. Clayton Cty., Georgia*, ––– U.S. ––––, 140 S. Ct. 1731, 1739, 207 L.Ed.2d 218 (2020).

When a plaintiff bases his claims of disparate treatment on circumstantial evidence (as Giles does here),[11] the court generally evaluates those claims using the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800 (1973).[12] *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1220–21 (11th Cir. 2019); *Sims v. MVM, Inc.*, 704 F.3d 1327, 1332 (11th Cir. 2013) ("following *Gross,* we have continued to evaluate ADEA claims based on circumstantial evidence under the *McDonnell Douglas* framework"). Under the *McDonnell*

---

[10] Section 1981 claims are actionable via 42 U.S.C. § 1983. *See Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 735 (1989).

[11] Giles states he "disagree[s] that he cannot point to direct discrimination by the Defendant" (doc. 49 at 11), but he does not elaborate on that conclusory statement.

[12] There are other methods of supporting claims of discrimination, *see, e.g., Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011), but Giles has not chosen to use any of those.

*Douglas* framework, "the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by showing (1) that [he] belongs to a protected class, (2) that [he] was subjected to an adverse employment action, (3) that [he] was qualified to perform the job in question, and (4) that [his] employer treated 'similarly situated' employees outside [his] class more favorably." *Lewis*, 918 F.3d at 1220–21 (citation omitted). If the plaintiff makes this showing by a preponderance of the evidence, the burden shifts to the defendant employer to show a legitimate, nondiscriminatory reason for its actions. *Id.* at 1221 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). If the defendant makes this showing, the burden shifts back to the plaintiff to "demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that "merges with the [plaintiff's] ultimate burden of persuading the [factfinder] that she has been the victim of intentional discrimination." *Lewis*, 918 F.3d at 1221 (citing *Burdine*, 450 U.S. at 256). "The inquiry into pretext requires the court to determine, in view of all the evidence, 'whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct.'" *Crawford v. Carroll,* 529 F.3d 961, 976 (11th Cir. 2008). A pretextual reason is not only one that is false but one that conceals an actual, discriminatory reason. *Brooks v. County Comm'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006).

### A. Race Discrimination Claim

Goodwill concedes Giles belongs to a protected class, that he suffered an adverse employment action, and that he was qualified to perform his job. (Doc. 44-1 at 8). However, it

denies Giles has evidence to support the fourth element of his prima facie case. Specifically, it points out Giles was replaced by Robinson, who is the same race as Giles, and argues Giles's only real comparator, Holmes, was not similarly situated to Giles. (*Id.* at 8-9). Giles does rely solely on Holmes as a comparator, but he contends the two are in fact similarly situated. (Doc. 49 at 11).

To demonstrate the fourth element of the disparate treatment *prima facie* case, a plaintiff must ordinarily point to comparators who are "similarly situated in all material respects." *Lewis*, 918 F.3d at 1226. In *Lewis*, the Eleventh Circuit provided a non-exhaustive list of the types of similarities that would "underlie a valid comparison": whether the comparator (1) "engaged in the same basic conduct (or misconduct) as the plaintiff"; (2) was "subject to the same employment policy, guideline, or rule as the plaintiff"; (3) was "ordinarily (although not invariably) . . . under the jurisdiction of the same supervisor as the plaintiff"; and (4) "share[d] the plaintiff's employment or disciplinary history." *Id.* at 1227-28.

Giles provides several facts to support Holmes is an appropriate comparator. In what might be grouped together as allegations of general misconduct, Giles cites: (1) the Jackass Incident; (2) the Bus Incident; and (3) Ford catching Holmes sleeping on the job. (Doc. 49 at 12-13). Giles notes he and Holmes were in the same department under the same management (Ford and Preston), both attended the same training classes, and both "were considered Rehabilitation Specialists." (*Id.* at 13). The remainder of his argument consists of disputing the circumstances under which he was disciplined or terminated. (*Id.* at 13-15).

Although Giles and Holmes were likely subject to the same general policies, none of the facts Giles highlights support *Lewis's* other criteria. The first problem for Giles is his position in the chain of command. The undisputed facts are that, at least for some time, Holmes reported

directly to Giles. Although it is true Preston and Ford were above Giles in the chain of command and thus, as a technical matter, that Holmes had "the same supervisor[s]" as Giles, there are significant differences between them. Taking the facts favorably to Giles, Giles had the authority to discipline Holmes, but was cautious about using that authority based on previous interactions with Preston and Ford. In any case, Giles did not discipline Holmes because Giles was not present for the incidents in question and believed Ford and/or Preston were. None of this negates the fact that Giles and Holmes were at differing sports in Goodwill's hierarchy from June 2019 until Giles's termination, with Holmes directly subordinate to Giles. *See Thompson v. Tyson Foods, Inc.*, 939 F. Supp. 2d 1356, 1367 (M.D. Ga. 2013) (rejecting as similarly situated comparators employees supervised by the plaintiff).[13] Since this was the time period when each of the incidents Giles highlights occurred, this weighs against considering Giles and Holmes similarly situated.

The second (and far more serious) problem with Holmes as a comparator is that the types of misconduct Goodwill alleges Giles engaged in are substantially different from Holmes's misconduct. Although, in the abstract, tardiness, sleeping on the job, use of inappropriate language, and dereliction of duty are all serious violations, Giles does not explain at all how a reviewing court could draw a meaningful comparison between them and the insubordination of which he was accused. *See Lewis*, 918 F.3d at 1227 (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 580, 583 (6th Cir. 1992), for the proposition that "a plaintiff terminated for 'misuse of [an

---

[13] The *Thompson* court applied a "similarly situated in all *relevant* respects" test. 939 F. Supp. 2d at 1364 (citing *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (emphasis added). *Lewis* supplanted that standard with the "all material respects standard." 918 F.3d at 1224, 1226 (abrogating *Holifield*). That said, to the extent there is a meaningful difference between the two, the standard the *Thompson* court used was more forgiving than the *Lewis* standard.

employer's] property' could not rely on comparators allegedly guilty of 'absenteeism' and 'insubordination.'"). Furthermore, other than tardiness—which was apparently never documented until after Giles was out of the picture—there is no evidence Holmes committed the same type of misconduct more than once. By contrast, Goodwill contends Giles was *repeatedly* insubordinate, and Giles's disciplinary history supports this contention—including a write-up described as a final warning prior to Giles's termination.[14] There is simply no meaningful overlap between Giles's disciplinary history and Holmes's.[15] Since they are so easily distinguished, Holmes is not an appropriate comparator. *See Lewis*, 918 F.3d at 1228 (quoting *Young v. United Parcel Service, Inc.*, 575 U.S. 206, 231 (2015)) ("a plaintiff and [his] comparators must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'"). Therefore, Giles cannot make out a prima facie case of race discrimination.

Finally, even assuming Giles could satisfy his prima facie case, he has pointed to no evidence at all supporting that his termination was a pretext for race discrimination. Here, Giles disputes that he was insubordinate (and, in fact, that he deserved virtually any of the discipline against him throughout his employment), but at most that goes to the falsity of the reason for his termination. Even if Ford wrongly considered Giles to have been insubordinate when she terminated him, Giles has not pointed to any record evidence from which a reasonable jury could

---

[14] Giles denies he deserved the discipline in question, but that does not bear on his prima facie case.

[15] One trivial overlapping circumstance is that Holmes and Giles were both accused of violating Goodwill's policies against the use of profanity. (*See* doc. 45-7 at 2; doc. 45-10 at 2). However, Giles's citation for this offense occurred as a component of the insubordination offense for which he was terminated, not as a standalone offense.

conclude the real motivation for his termination was his race. *See Brooks*, 446 F.3d at 1163. Consequently, he cannot meet his burden under *McDonnell Douglas*, and Goodwill's motion for summary judgment is due to be granted as to Giles's race discrimination claim.

### B. Age Discrimination Claim

As with Giles's race discrimination claim, Goodwill concedes the first three elements of Giles's prima facie case as to his age discrimination claim. (Doc. 44-1 at 11). It once again centers its argument on Giles's lack of comparators. (*Id.*).

Giles offers the conclusory statement he can prove his prima facie case (doc. 49 at 16), but otherwise makes no effort to show he was treated differently than any comparator on the basis of age. To the extent he relies on either Robinson or Holmes as a comparator here, they are inapposite for the same reasons as they are above. Thus, contrary to his contention, he cannot make out a prima facie case of age discrimination. Furthermore, Giles's sole cited evidence of age-related bias is that Ford and Preston "constantly made reference to his pace of work." (Doc. 49 at 15). Even if these comments could be considered age-related,[16] Giles makes no effort to connect them to his termination such that they could support pretext. Consequently, Goodwill's motion is due to be granted as to Giles's age discrimination claim as well.

---

[16] Giles arguably contends this is direct evidence of age discrimination (*id.* at 16), but if he does he misunderstands the nature of direct evidence. Direct evidence is evidence that "proves the existence of a fact without inference or presumption." *Jons v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1270 (11th Cir. 2017). All older workers are not necessarily slow workers, nor are all slow workers necessarily old; another logical step must follow to connect comments about Giles's speed to his age.

## IV. Conclusion

For the reasons stated above, Goodwill's motion for summary judgment (doc. 44) is **GRANTED**. A separate order will be entered.

DONE this 23rd day of September, 2022.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE